**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**HEIDI J. INGRAO and BRADLEY B. INGRAO,**
**as Parents and Natural Guardians of RBI, an infant,**

                                    **Plaintiffs,**

- against -                                                        **1:01-CV-730**

**THE COUNTY OF ALBANY, NEW YORK, and**
**THE COUNTY OF MONTGOMERY, NEW YORK,**

                                    **Defendants.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**AMENDED**
**DECISION & ORDER[1]**

## I.  INTRODUCTION

        Plaintiffs Heidi J. Ingrao and Bradley B. Ingrao, the adoptive parents of  RBI, commenced

this action on May 18, 2001 asserting claims against Albany County and Montgomery County for

acts or omissions that purportedly occurred while RBI was under the care of the Albany County

Department of Social Services ("ACDSS").  See dkt. # 1.  Part of the action was stayed for several

years due to the pendency of a bankruptcy proceeding by Montgomery County's insurance carrier,

---

[1]This Decision and Order amends the Decision and Order entered on September 29, 2006 by substituting a pseudonym for the name of a foster family in which Plaintiffs contend that the infant child was sexually abused and struck by the foster family's then 15-year-old son. In this regard, this Decision and Order supersedes the September 29, 2006 Decision and Order,  and the Clerk of the Court is instructed to seal  the September 29, 2006 Decision and Order so as to not make the September 29, 2006 Decision and Order available on the public docket.

<u>see</u> dkt. # 13, # 15, # 16, # 17, # 20, although discovery did proceed with regard to claims against

Albany County.  On July 2, 2004, Plaintiffs commenced a separate action against individual

employees of the ACDSS and the Montgomery County Department of Social Services ("MCDSS").

<u>See</u> Compl. [dkt. # 1] in <u>Ingrao v. Grossi, et al.,</u> 1:04-CV-769 ("<u>Ingrao II</u>").[2]   On October 15, 2004,

Plaintiffs filed an Amended Complaint in this action. <u>See</u> Am. Compl.  dkt. # 92.

        In the Amended Complaint, Plaintiffs assert that Defendants' actions or omissions

amounted to actionable negligence or gross negligence (First Cause of Action); violated the Federal

Adoptive Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620-628, 670-679a (Second

Cause of Action); violated the Federal Child Abuse Prevention and Treatment Act, 42 U.S.C. §§

5101-5106 (Third Cause of Action); violated New York Social Services Law and related rules and

regulations (Fourth Cause of Action); deprived Plaintiffs of their rights to substantive due process as

guaranteed under the Fourteenth Amendment to the United States Constitution (Fifth Cause of

Action); and constituted "fraud, concealment, and/or misrepresentation or gross negligence" (Sixth

Cause of Action).  It should be noted that although the Third, Fourth, and Fifth Causes of Action

assert violations of federal law, only the Fifth Cause of Action is brought pursuant to 42 U.S.C. §

1983.  Subject matter jurisdiction is action is based upon the diversity of citizenship of the parties

and the federal questions presented. <u>See</u> <u>id.</u> ¶¶ 4-11.

        Presently before the Court are (1) a motion for summary judgment pursuant to Fed. R. Civ.

P. 56 by Albany County, and (2) a cross-motion for summary judgment by Plaintiffs.  For the

reasons that follow, Albany County's motion is granted in part and denied in part, and Plaintiffs'

---

        [2]<u>Ingrao II</u> involves similar claims to those asserted in this action and the claims arise from the same facts and
circumstances as give rise to the instant action.

motion is denied.

## II.  STANDARD OF REVIEW

On the pending motions, the Court will apply the well-established standard for deciding summary judgment motions as more fully set forth in the March 31, 2006 Decision and Order in Ingrao II.  See 3/31/06 Dec. & Ord., pp. 2-4 [dkt. # 91] in Ingrao II.

## III.  BACKGROUND[3]

On May 11, 1990,  RBI  was born to a 15 year old mother, Ruth B.  At the time,  Ruth B. was residing in a New York State Division for Youth ("DFY") facility in Onondaga County, New York.  In October 1990, at age 3 ½ months, RBI was removed from Ruth B.'s legal and physical custody upon a finding by the Onondaga County Family Court of inadequate guardianship/neglect on the part of  Ruth B.  Although there was no finding of sexual abuse by Ruth B., there is some indication, albeit minimal, that Ruth B. sexually abused RBI.[4]  RBI was placed in the care and custody of the Onondaga County of Social Services.

In November 1990, the legal and physical custody of RBI was transferred to the ACDSS.[5]

---

[3] The parties have submitted a voluminous record on these motions and, suffice it to say, there is considerable dispute as to the facts and reasonable inferences to be drawn from those facts. Distillation of the undisputed facts pertinent to the pending motions is made more difficult because Plaintiffs' Local Rule 7.1 Counter-Statement of Material Facts contains repeated legal and factual arguments. In many instances, Defendant has denied a stated fact simply by citing to the same portion of the record that Plaintiffs contend supports their assertion.  The facts set forth above are culled from those portions of the record where there either exists no dispute, or, where the denial of a fact is not supported by the cited citation.  Argumentative inferences from certain supported facts are not accepted for purposes of the Background, although such inferences may be referenced as a party's contention.

[4] In an evaluation of RBI conducted in November 2004 that included review of RBI's records, Jonathan M. Horowitz, M.D. noted that Ruth B.'s neglectful conduct involved "rough handling" of RBI that included inappropriate and painful manipulation of his arms, legs, penis and testicles.  However, Dr. Horowitz opined that  "[a] three month old infant would experience this mistreatment as painful but would not have the experience of being sexually abused."

[5] The Onondaga County Family Court Order that removed RBI from Ruth B.'s custody required that the custody of RBI be in the department of social services of the county in which Ruth B. resided or was placed.

3

According to Onondaga County, at the time RBI was transferred into ACDSS's custody, he was a healthy child with no known special needs although, as is apparent, he had been the victim of neglect and/or abuse by his mother.  There is also an indication that Onondaga County reported to Albany County that the birth mother had a psychiatric history and a violent nature.   RBI remained in the primary custody of the ACDSS up to July 10, 1997, and "was subject to after-adoption follow-up and supervision [by ACDSS] for another three years until July 10, 2000." Compl. in Ingrao II ¶ 19.

        Once RBI came under the care of ACDSS, he was placed in various certified foster care homes and was seen for a developmental assessment.  RBI presented with no exceptional physical or psychological conditions. For approximately the first year (November 15, 1990 to November 25, 1991), ACDSS caseworker Teresa Fitzpatrick handled RBI's case.  In January of 1991,  when RBI was eight months old,  he was placed with the McElroy foster care family.  The Family Court had ordered supervised visitation between Ruth B. and RBI, and Fitzpatrick conducted the supervised visitation in her role as an ACDSS employee.  The record reflects that during the supervised visitation, Ruth B. demonstrated an overall lack of interest in bonding with the child and generally deficient parenting skills.  Plaintiffs contend that before this visitation with Ruth B., RBI was a very happy baby with no notable problems.  However, after visits with Ruth B., Mrs. McElroy began to notice negative changes in RBI's behavior.  Mrs. McElroy communicated this information to ACDSS representatives.

        In April of 1991, Fitzpatrick noted in her caseworker file that she felt that if Ruth B. did not progress in her involvement with RBI by October 1991, a termination of parental of rights action should be commenced.   The ACDSS determined to have RBI and Ruth B. seen by a consultant for a

"family assessment." Shirley Schlossberg, a certified social worker, conducted the family

assessment in July 1991. Schlossberg recommended that a parental termination proceeding be

commenced.

ACDSS contends that, based upon its obligation to exercise "diligent efforts" to try to

reunite a parent and child before moving to terminate parental rights, see N.Y. Soc. Serv. L. § 384-

b(1)(McKinney's 1999);[6] Santosky v. Kramer, 455 U.S. 745, 767 (1982)("The State's interest in

finding the child an alternative permanent home arises only 'when it is *clear* that the natural parent

cannot or will not provide a normal family home for the child.'") (quoting N. Y. Soc. Serv. Law §

384-b(1)(a)(iv)) (emphasis added by the Sp. Ct.); In re Marino S., Jr., 100 N.Y.2d 361, 368-69

---

[6] Up until February 19, 1999 (when the statute was amended), New York Social Services Law § 384-b(1) provided in relevant part:

1. Statement of legislative findings and intent.

(a) The legislature hereby finds that:

* * *

(ii) it is generally desirable for the child to remain with or be returned to the natural parent because the child's need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered;

(iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home; and

(iv) when it is clear that the natural parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child.

(b) * * *

It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nurturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating parental rights and freeing the child for adoption.

(2003),[7] it determined not to petition to terminate Ruth B.'s parental rights and instead to work towards reuniting Ruth B. and RBI.  In this regard, Ruth B. was provided "parenting classes" and was allowed to exercise progressively less restrictive visitation, working up to unsupervised overnight visitation. Plaintiffs contend that the visitation was fraught with problems and indications that RBI was not being properly cared for during visitation, including problems with Ruth B.'s male friend "BB" who was regularly in Ruth B.'s apartment.  These problems were communicated to ACDSS representatives by Mrs. McElroy.  In addition, Mrs. McElroy reported that RBI would cry and scream and resist going to the visits, and would be very emotionally upset upon returning from visits with Ruth B.  Plaintiffs contend that ACDSS representatives persuaded Mrs. McElroy not to file "hotline" reports[8] about the conditions and circumstances she observed.

In May 1993, ACDSS decided to attempt a "trial discharge" whereby RBI would be allowed

---

[7] In In re Marino S.,  the New York Court of Appeals stated:

As a rule, when a child has been removed from the home based on alleged abuse or neglect--as these three children were--the social services official responsible for the child must attempt to reunite the child with the birth parent; this includes efforts at rehabilitation so as to render the parent capable of caring for the child (see Family Ct Act § 1052 [b] [i] [A]; § 1055 [c]). Such efforts typically include facilitation of parent-child visits and provision of services to the parent, including assistance with housing, employment, counseling, medical care and psychiatric treatment (see Family Ct Act § 1055 [c]).

Similarly, in termination of parental rights proceedings (governed by  Social Services Law § 384-b) a foster care agency generally must demonstrate that diligent efforts at reunification have been undertaken. Such efforts are not required, however, where they would be detrimental to the best interests of the child (see Social Services Law § 384-b [8] [a] [iv]). These provisions implement New York's strong public policy of both keeping families together and protecting the health and safety of children (see Social Services Law § 384- b [1]).

100 N.Y.2d at 368-69.   The reference to Social Services Law § 384-b[8][a][iv]'s allowance to dispense with diligent efforts to reunite the family refers to Social Services Law § 384-b after New York passed the Adoption and Safe Families Act in 1999.   Subsection 8(a)(4) was not in Social Services Law § 384-b before 1999.

[8] New York Social Service Law § 422 establishes a statewide "central register" to receive telephone calls of child abuse and maltreatment.  The statewide central register is staffed twenty four hours a day, seven days per week and is colloquially referred to as the "Child Abuse Hotline."

to live with Ruth B. on a full time basis although ACDSS would retain legal custody and supervise RBI's time with his mother.  This trial discharge lasted for approximately eight (8) months, from May 7, 1993 to January 11, 1994, during which the McElroys were allowed regular "visits" with RBI.  Again, Plaintiffs contend that there were numerous and profound problems occurring while RBI was in Ruth B.'s physical custody, and that these problems were negatively affecting RBI's physical, emotional, and psychological well being.  Mrs. McElroy relayed to ACDSS caseworkers many of the problems that she observed when at Ruth B's apartment, and describes what she felt was RBI's deteriorating emotional well being.

At some point during this trial discharge, when RBI was about three years old, one of RBI's pre-school teachers observed RBI gyrate his hips and stick his tongue in and out of his mouth in what the teacher felt was a sexually suggestive manner.  This led the teacher to conclude that RBI may have seen or been subjected to a sexual act.  Although this information was conveyed to ACDSS, Plaintiffs contend that the ACDSS failed to properly investigate it.

On December 24, 1993, when Mrs. McElroy went to pick up RBI for a visit, she observed that there was no food in the refrigerator, and that Ruth B.'s new male friend, "L," was laying on top of RBI on the bed restraining him.  Mrs. McElroy reported this to RBI's caseworker and, allegedly, was told not to call the Child Abuse Hotline.  ACDSS case records do reflect, however, that the caseworker told Mrs. McElroy that the caseworker would discuss the situation with ACDSS supervisors. See Ex. N. 1153.  The notes also reflect that a telephone conference took place the following day between the caseworker and her supervisor, and that the supervisor advised the caseworkers to "conference w/ legal and . . . try and get the case in front of a Judge and ask for some judicial direction." Id.

On January 11, 1994, after a call was placed to the Child Abuse Hotline alleging that Ruth B. had hit, pushed, spit on, bitten, pinched and yelled at RBI,  ACDSS removed RBI from his mother's physical custody and placed him in the McElroys' foster home.  Upon removal, the child was examined and, based upon the numerous bruises and injuries he had sustained while in his mother's care, ACDSS determined that Ruth B. had abused and maltreated RBI.

After the child was returned to the McElroy foster home, the McElroys felt that RBI had "changed."  In this regard, they observed that RBI continually and repeatedly "tantrumed" and was regularly  "acting out" sexually.   The McElroys determined they could no longer have RBI reside in their home and asked the ACDSS to find a new placement for RBI.

In May of 1994, Ruth B. surrendered her parental rights.  With Ruth B.'s surrender, RBI was "freed" for adoption.  Accordingly, the ACDSS began to seek a "pre-adoptive" foster home for RBI - that is, a foster home family that was interested in eventually adopting RBI. At some point in time, it had been concluded that RBI suffered from severe hearing limitations and, therefore, he attended a special education pre-school program for deaf children at the Altamont School.  While at the Altamont School, RBI worked with a teacher named Sara Doe.[9]  Mrs. Doe and her husband expressed an interest in becoming certified foster care parents for RBI and perhaps adopting RBI. Although they lived in Montgomery County, the Does were certified as foster parents by Albany County.  On June 30, 1994, RBI was placed in the Does' foster home as a pre-adoptive placement.

However, while the child was at the Does' home, he repeatedly acted in a violent and sexual manner (simulating sexual acts with dolls, exposing himself to the Does' young daughter, and masturbating).  On August 11, 1995, ACDSS caseworker Claudia Grossi requested that an

_____

[9]This is a pseudonym to protect the identity of the Does' child.

8

evaluation be conducted of RBI at the St. Anne's Institute due to the Does' reports that RBI repeatedly "acted out" in a sexual manner and because the child "reportedly tantrums excessively at home and in school." Plt. Ex. OO.  The evaluation request, which was filled out by Grossi, indicated that sexual abuse was suspected. Ex. "NN."  Grossi testified at her deposition, however, that at the time she requested the evaluation she did not know whether RBI had himself been subjected to a sexual act, and believed it was possible that he might have witnessed sexual acts which, according to Grossi, would be within the definition of sexual abuse. See Gross Dep., pp. 133-35 (ex. "UUUU").

The evaluation was conducted by the St. Anne Institute's Sex Abuse Preventive Services program on October 17, 1995.  During the evaluation, when asked if anyone ever touched his private parts, RBI responded "a baby."  Ex. OO. He did not disclose any particular instances of sexual abuse occurring to him during the evaluation. Id.  The Does indicated during the evaluation that their main concern was RBI's continually escalating level of tantrums and aggressive behaviors, and revealed that at times their 15-year-old son had "backhanded" RBI when he became aggressive. Id.  The Does indicated that they thought the best course of action was for the ACDSS to find RBI another pre-adoptive home.   ACDSS did not immediately remove RBI from the Does's home.

In April of 1996, ACDSS requested that Children's Hospital in Boston evaluate RBI.  The main concern presented at this evaluation was RBI's aggressiveness. See Ex. QQ. The evaluators found that "RBI would appear to be presenting more with behaviors that were engendered by his environment, rather than a  clear cut, biologic-based psychiatric or neurologic disorder." Id.  The evaluators surmised that RBI's behavioral problems might have been caused by lack of early nurturing, abuse or maltreatment during early life, repeated changes in family settings during his

life, frustration arising from his hearing impairment and limitations on his ability to communicate, a form of Attention Deficit/Hyperactivity Disorder, or a combination of all of these. Id. It was concluded that, in order to address these issues, "[m]uch support will be needed by the family [RBI] lives with and the school he attends." Id.

In July 1996, RBI was placed in the pre-adoptive foster home of Plaintiffs Bradley and Heidi Ingrao. Before RBI was placed in their home, the Ingraos told ACDSS representatives "that they could not adopt a child who had been sexually abused." Plaintiffs contend that, despite reason to believe that RBI had been the victim of sexual abuse and was suffering from emotional disturbances caused by past abuse and/or neglect, ACDSS assured the Ingraos that RBI had not been sexually abused.

Almost immediately, the Ingraos observed numerous inappropriate acts by RBI. In addition, RBI told the Ingraos that the Does' son would play "snake" with him, dress him in women's clothes, put lipstick on him, and put nail polish on him, all of which the Ingraos felt were indicative of sexual abuse by the Does' son. B. Ingrao Dep. p. 160 (ex. "XXX"). Bradley Ingrao also testified that after school started in September 1996, RBI began to regularly become so "agitated" that the Ingraos would need to physically restrain RBI "for hours at a time." Id. at 156. Because RBI would break things, including putting his hands through glass windows, the Ingraos had to maintain a room in their house "with everything removed from it, Plexiglas on the windows and mattresses and cushions on all walls and floor, so that [RBI] could be retrained." Id. The Ingraos, who lived in the State of Florida at the time, spoke with their local social services agency and requested that the child see a psychiatrist. Id. p. 166. The psychiatrist diagnoses the child with Attention Deficit Disorder and prescribed a medication but, other than a limited sedative effect from

the medication, RBI's conduct continued.  Id. pp. 166-67.  Plaintiffs contend that in the few

conversations they had with ACDSS's representatives, they were not told that RBI had been

suspected of having been sexually abused, and instead were told that RBI just needed a loving and

stable home.

 RBI was adopted by the Ingraos in July of 1997.   Thereafter, he was diagnosed with post-

traumatic stress disorder secondary to abuse, neglect and trauma, and underwent multiple

psychiatric hospitalizations.  In 1999, when RBI was just shy of nine years old, the Ingraos placed

him in a residential psychiatric center for the deaf specializing in severely emotionally disturbed

children (the Walden School)  where he has remained as a full time resident.  In the fall of 1999,

RBI reported in therapy at the Walden School that he had been sexually abused by minors in the

Does' home, including the Does' son.  The therapist called ACDSS caseworker Barbara Lynch and

advised of the disclosure. Lynch did not disclose to the therapist that RBI had been evaluated for

sexual abuse by St. Anne's Institute.

**IV.  DISCUSSION**

    **a.   Federal Adoptive Assistance and Child Welfare Act of 1980**

Defendant Albany County argues that the Second Cause of Action, asserting a violation of

the Federal Adoptive Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620-628, 670-679a

("FAACWA"), must be dismissed because no independent private right of action exists under the

statute. Plaintiffs fail to oppose this portion of Defendant's motion. The failure to oppose a motion

for summary judgment on a certain claim is deemed abandonment of the claim, see Rizzo-Puccio v.

College Auxiliary Services, Inc., 216 F.3d 1073 (2d Cir. 2000)(claims not addressed in opposition

to defendants' motion for summary judgment were deemed abandoned), and, in the Northern District

of New York, is deemed consent to granting that portion of the motion. See N.D.N.Y.L.R. 7.1(b)(3);

Bundy Am. Corp. v. K-Z Rental Leasing, Inc., 2001 WL 237218, at *1 (N.D.N.Y. Mar. 9,

2001)(Hurd, J.); Beers v. General Motors Corp., 1999 WL 325378, at *8 (N.D.N.Y. May 17,

1999)(McCurn, S.J.).  Thus, the FAACWA claim is subject to summary dismissal on this basis.

Further, Plaintiffs have failed to demonstrate that an independent private right action exists

under any provision of the Adoptive Assistance and Child Welfare Act of 1980, or that an implied

right of action exists pursuant to 42 U.S.C. § 1983 for a violation of this act.  Accordingly, the

motion in this regard is granted, and the Second Cause of Action is dismissed. See Polite v. Casella,

901 F. Supp. 90, 93 (N.D.N.Y. 1995)(McAvoy, C.J.)(finding no actionable Section 1983 claim

premised upon a purported violation of the FAACWA); see also McMahon v. Tompkins County

Dept. of Soc. Serv., 1998 WL 187421, at *5-*7 (N.D.N.Y. April 14, 1998)(Pooler, J.)("[B]ecause

[42 U.S.C. § 671(a)(7)] contains only a general requirement as to monitoring and evaluation and

provides no clear guidelines or standards concerning how that requirement is to be implemented, I

find that its terms are sufficiently vague and amorphous that they do not create a federal right

enforceable under Section 1983.")(citing Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 509

(1990)); Daniel H. v. City of New York, 115 F. Supp. 2d 423, 428 (S.D.N.Y. 2000)("[T]he Court

holds that plaintiffs do not have an implied private right of action under 42 U.S.C. § 1983 for

violations of [section 675 and three subsections of section 671 of the Adoption Assistance] Act.").

### b.  Child Abuse Prevention Act

Similarly, Defendant Albany County moves to dismiss the Third Cause of Action which

asserts a claim based upon purported violations of the Federal Child Abuse Prevention and

Treatment Act, 42 U.S.C. §§ 5101-5106 ("CAPTA").  Defendant contends that no private cause of

12

action exists under CAPTA. Plaintiffs also have failed to oppose this portion of Defendant's motion. Accordingly, the CAPTA claim is subject to summary dismissal based upon Plaintiff's implied abandonment and/or consent to dismissal.

Further, Plaintiffs have failed to demonstrate that any provision of CAPTA provides for an independent private right of action, or that an implied right of action exists pursuant to 42 U.S.C. § 1983 for a violation of this act. Accordingly, the motion in this regard is granted, and the Third Cause of Action is dismissed. See Hilbert S. v. County of Tioga, 2005 WL 1460316, at *13 - *14 (N.D.N.Y. June 21, 2005)(McAvoy, S.J.)(Finding that "CAPTA does not create clear and unambiguous obligations on the State that arise to the level of an enforceable right" and thus dismissing a Section 1983 claim premised upon an alleged violation of CAPTA.).

**c.  New York Social Services Law and related rules and regulations**

Defendant Albany County also moves to dismiss the Fourth Cause of Action, arguing that the Plaintiffs have failed to identify any provision of the New York Social Services Law (or related codes and regulations) that allows for an independent private right of action premised upon a violation of such law. Plaintiffs oppose this portion of the motion, arguing that a private right of action exists because caseworkers knowingly and willfully failed to report incidents of suspected abuse or maltreatment.

This Court has previously held that an independent right of action exists under N. Y. Soc. Serv. L. § 420(2) where a mandated reporter willfully and knowingly fails to report an instance of suspected child abuse or maltreatment. See Doe v. Jefferson County, 985 F. Supp. 66, 70 (N.D.N.Y. 1997)(McAvoy, C.J.); see also N.Y. Soc. Serv. L. 420(2)("Any person, official or institution required by this title to report a case of suspected child abuse or maltreatment who knowingly and

13

willfully fails to do so shall be civilly liable for the damages proximately caused by such failure."). New York Social Services Law § 413 appears to impose the reporting obligation on the social service agency which employs an offending social service caseworker. Thus, inasmuch as Plaintiffs have submitted some evidence from which a reasonable jury could conclude that ACDSS's caseworkers willfully and knowingly failed to report a case of suspected child abuse or maltreatment, Defendant's motion in this regard is denied.

Viewing the evidence in the light most favorable to Defendant, a genuine question of material fact exists as to whether any representative knowing and willfully failed to report such a case. Indeed, there is evidence from which a reasonable fact finder could conclude that, when presented with reports of abuse or maltreatment, caseworkers reported to their supervisors and the agency engaged in investigative efforts. Further, where no report was made or investigation conducted, a jury question exits as to whether the omission amounted to a knowing and willful failure to report suspected child abuse or maltreatment. Therefore, Plaintiffs' cross- motion in this regard is also denied.

### d. Substantive Due Process Claims

Next, Defendant moves to dismiss Plaintiffs' claims brought under the Substantive Due Process Clause of the Fourteenth Amendment. Plaintiffs have opposed this portion of the motion and contend that they are entitled to summary judgment on these claims. For the reasons that follow, Defendant's motion in this regard is granted in part and denied in part, and Plaintiffs' motion is denied.

### RBI's Substantive Due Process Claim

As Judge Pooler wrote when she was on the District Court bench:

> The substantive component of the due process clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." Interport Pilots Agency, Inc. v. Sammis, 14 F.3d 133, 144 (2d Cir. 1994) (internal quotation and citation omitted).   In this regard, the due process clause prevents "government 'from abusing [its] power, or employing it as an instrument of oppression.'" DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting Davidson v. Cannon, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)).

McMahon, 1998 WL 187421, at * 2.

Of course, "[t]he 'first step in substantive due process analysis is to identify the constitutional right at stake.'" Id. at * 3 (quoting Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994)).   Plaintiffs contend that the Albany County Defendant failed to protect RBI from harm by his mother and others while in foster care.   "[A] state agency may be liable under the Due Process Clause for failing to protect children in their custody." Phifer v. City of New York, 289 F.3d 49, 62 (2d Cir. 2002) (citing Doe v. New York City Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981)).   "When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." Doe v. New York City Dep't of Social Servs., 649 F.2d 134, 141 (2d Cir. 1981).

> In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." [County of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708 (1998)].  Lewis reaffirmed the principle that the Fourteenth Amendment is not a "font of tort law." Id. at 848, 118 S. Ct. 1708.  It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable.  The Lewis Court made it clear, for example, that "negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. at 849, 118 S. Ct. 1708.

Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005).   "Determining whether the conscience is

shocked by lesser levels of culpability than intentional infliction of physical harm requires [courts] to make 'closer calls.'" Pena, 432 F.3d at 113 (quoting Lewis, 523 U.S. at 849, 118 S. Ct. 1708). In situations where government officials are not required to make split-second determinations, deliberate indifference is enough to shock the conscience. Pena, 432 F.3d at 113. "[T]his mental state . . . requires proof that the defendant[s] focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk." Id. (quoting Woodward v. City of Worland, 977 F.2d 1392, 1399 n. 11 (10th Cir. 1992)).

Knowledge of a specific harm that might befall a child in foster care, however, "is not the only type of knowledge that will suffice" to make out a substantive due process claim. Doe, 649 F.2d at 145. "Defendants may be held liable . . . if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." Id. Under this theory, one may infer "deliberate unconcern for plaintiffs' welfare from a pattern of omission revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse." Id.; Tylena M. v. Heartshare Children's Servs., 390 F. Supp.2d 296, 306-07 (S.D.N.Y. 2005).

As noted by the Southern District in Tylena M.,

The Second Circuit has explained that, although "ordinary negligence by itself could not establish a cause of action under [Section] 1983," Doe, 649 F.2d at 143, "repeated acts of negligence [can] be evidence of indifference." Id. at 142. Evidence of "gross negligent conduct creates a strong presumption of deliberate indifference." Id. at 143. The Second Circuit has "often equated gross negligence with recklessness, and [has] defined it as the 'kind of conduct ... where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and

16

deliberately acts or fails to act in conscious disregard or indifference to that risk.'" <u>Poe v. Leonard</u>, 282 F.3d 123, 140 n. 14 (2d Cir. 2002)(quoting <u>Bryant v. Maffucci</u>, 923 F.2d 979, 985 (2d Cir. 1991))(further citations omitted). <u>See also</u> <u>Doe</u>, 649 F.2d at 143 n. 4 (Gross negligence is an "indifference to present legal duty and utter forgetfulness of legal obligations, so far as other persons may be affected, [and] a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.") (quoting <u>Burke v. Cook</u>, 246 Mass. 518, 141 N.E. 585, 586 (1923)).

390 F. Supp.2d at 306.

Thus, to succeed on a § 1983 claim for the nonfeasance of affirmative duties to those in its custody, a plaintiff must demonstrate the following two elements:

(1) "the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest;" and (2) "the officials in charge of the agency being sued must have displayed a mental state of 'deliberate indifference' in order to 'meaningfully be termed culpable' under § 1983."

<u>Tylena M.</u>, 390 F. Supp.2d at 302 (quoting <u>Doe</u>, 649 F.2d at 141).

Further, it is well-settled that under Section 1983, municipalities are not exposed to *respondeat superior* liability for misdeeds by municipal employees. <u>Walker v. City of New York</u>, 974 F.2d 293, 296 (2d Cir. 1992), <u>cert. denied</u>, 507 U.S. 961 (1993)(citing <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658 (1978)). "Rather, it is only when the municipality itself commits the misdeed, that is, 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.'" <u>Walker</u>, 974 F.2d at 296 (quoting <u>Monell</u>, 98 S.Ct. at 2037). Thus, in order to hold a municipality responsible for an alleged constitutional deprivation, a plaintiff must prove that "the entity's policy or custom played a part in the violation of federal law." <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991). Such a policy or custom may be established by proof that the municipal policymaker failed to train or supervise its employees

17

where they "should have known that inadequate ... supervision was 'so likely to result in the violation of constitutional rights, that [they] ... can reasonably be said to have been deliberately indifferent to the need.'" Walker, 974 F.2d at 298 (quoting City of Canton v. Harris, 489 U.S. 378, 390(1989)); see also Amnesty America v. Town of West Hartford, 361 F.3d 113, 127 n. 8 (2d Cir. 2004) (stating that the need for better or more supervision must be obvious).

As the Supreme Court stated in City of Canton, 109 S. Ct. at 1205:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific [employees] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible. . . if it actually causes injury.

The Supreme Court continued to note that,

> [it will not suffice] to prove that an injury or accident could have been avoided if a[] [government employee] had had better or more training, sufficient to equip him [or her] to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury. . . . [F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury. . . . Thus . . . [the plaintiff] must still prove that the deficiency in training actually caused the [government employees'] indifference to [the risk of harm]. . . . In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. . . .

City of Canton, 109 S. Ct. at 1206. The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a "conscious choice" rather than mere negligence. Amnesty Am., 361 F.3d at 128.

In support of RBI's substantive due process claim, Plaintiffs assert a host of individual theories which, they contend, constitute separate policies or practices that demonstrate ACDSS's

18

deliberate indifference to RBI's welfare and that caused him to suffer harm.  In this regard, Plaintiffs

assert that the ACDSS had separate policies or customs of : (1) failing to move for termination of

the parental rights of the parents of foster children in its charge although authorized to do so; (2)

failing to investigate and/or report evidence of abuse or neglect occurring to foster children in its

charge; (3)  "not protecting foster children from being hit by older foster children if there were no

marks left;" (4) failing to train or supervise caseworkers in certain aspects of their job, such as

detecting and treating emotional difficulties or sexual abuse experienced by foster children; (5)

failing to train and supervise caseworkers on intervention tools and procedures that are designed to

protect children in foster care; (6) failing to train and supervisor caseworkers on proper monitoring

of the welfare of children in long-term foster care placements; and (7) failing to train caseworkers

on "matching children to foster families."  See Plf. Mem. L., pp. 4-21.

Although the parties attempt to parse out each of these alleged failures for purposes of

determining whether any one, individually, arose to the level of a policy, practice, or custom causing

a substantive due process violation, the Court sees the allegations as interrelated and inextricably

intertwined.  The allegation, at least as far as the Court can see, is not that RBI had a substantive due

process right to have his biological mother's parental rights terminated, or a substantive due process

right to have caseworkers implement certain "intervention tools," or even a substantive due process

right to have social service officials follow any specific state-mandated procedures, but rather that

he had a substantive due process right to be safe and protected while in the care of the ACDSS.  In

this case, if there is a substantive due process violation, it will be because a jury finds, from the

totality of circumstances, that the ACDSS was deliberately indifference to this right as evinced by

ACDSS's failure to investigate dangers that were know (or reasonably should have been known),

and failed to implement available procedures that could have ameliorated such dangers.

A few points require clarification. First, from a factual perspective, the substantive due process claim is a close call. The parties have submitted a mountain of evidence on these motions that includes a two-thousand (2,000) page case record chronicling ACDSS's involvement with RBI while he was in ACDSS's care. While Plaintiffs' counsel has done a thorough job of wading through these records and picking out instances that arguably demonstrate that ACDSS caseworkers could have done a better job, the extensive record hardly reflects that RBI was left unsupervised and forgotten while in foster care. Because a reasonable jury might conclude that the conglomeration of these instances evince a pattern, practice, or custom of deliberate indifference to RBI's rights, Defendant's motion for summary judgment must be denied. By the same reasoning, however, the record hardly reflects a situation that would entitle Plaintiffs to a judgment as a matter of law on this substantive due process claim. Therefore, Plaintiffs' cross-motion in this regard must also be denied.

Second, a legal issue bears noting. The Court is not holding that RBI's substantive due process rights might have been violated merely because ACDSS caseworkers failed to terminate Ruth B.'s parental rights, or failed to follow certain protocols or state mandated procedures. Rather, the Court's decision to deny Defendant's motion for summary judgment is based upon the view that a reasonable jury might conclude, based on the totality of circumstances presented in this case, that the failure of ACDSS caseworkers to use tools that could, in some way, serve to protect the child from harm, or to be trained in the use of these tools, amounted deliberate indifference to RBI's safety. Thus, a jury might conclude that, in this particular case, the failure to move to terminate Ruth B.'s parental rights, or to file certain reports regarding RBI's treatment, could be part of the *res*

*gestate* that amounts to a policy or practice of deliberate indifference to RBI's well being that existed the ACDSS.  By the same reasoning, however, a jury might conclude that the ACDSS's decision not to take certain action (such as deciding not to move to terminate Ruth B.'s parental rights or failing to remove RBI from his mother's care sooner during the "trial discharge") was reasonable under the law and circumstances as they existed at the time, and that ACDSS's conduct in failing to move to terminate parental rights (or in failing to stop visitation earlier) did not evince deliberate indifference to RBI's safety while in foster care.   In this regard, a jury could conclude that the complained of actions or omissions were reasonable under the circumstances and thus do not, either individually or in the context of all the facts and circumstances related to RBI, evince a deliberate indifference to RBI's right to remain safe while in ACDSS's care.

### Heidi J. & Bradley B. Ingrao's Substantive Due Process Claim

Plaintiffs also seem to assert that Heidi J. & Bradley B. Ingrao's substantive due process rights have been violated because ACDSS caseworkers failed to disclose to them that RBI had been sexually abused. See Pl. Mem. L, pp. 12-14.  Assuming *arguendo* that RBI had been sexually abused either before he came into the care of the ACDSS or while in foster care, and assuming further that ACDSS caseworkers were aware of this fact but failed to disclose it to the Ingraos, Plaintiffs nevertheless have failed to identify a liberty interest possessed by the Ingraos that was violated by the omission.  Rather, it appears that the claim is one sounding in "wrongful adoption" under New York tort law (as addressed below), but not one that is actionable under the Fourteenth Amendment.  Therefore, Defendant's motion for summary judgment in this regard is granted, and, to the extent Plaintiffs assert a substantive due process claim by and on behalf of Heidi J. & Bradley B. Ingrao, the claim is dismissed.

21

### e.  Negligence Claims

Plaintiffs' primary negligence claim is that caseworkers failed to perform their duties to protect RBI from harm in a reasonably competent manner, and that RBI suffered harm as result of this negligence. The factual evidence presented on this motion is sufficient to allow a jury to conclude that the ACDSS was negligent in its supervision of RBI while in its care and that this negligence caused RBI to suffer harm. This is sufficient to state an actionable claim for negligence under New York law. See Sean M. v. City of N.Y., 20 A.D.2d 146, 156-58 (1st Dept. 2004). Therefore,  Defendant's motion for summary judgment in this regard is denied.

On the other hand, when viewing the evidence in the light most favorable to Defendant, a reasonable jury could easily conclude that the ACDSS was not negligent in performing duties to supervise RBI's stay in foster care.  Thus, Plaintiffs' cross-motion in this regard is denied.

Plaintiffs also argue that Plaintiffs Heidi J. & Bradley B. Ingrao have a negligence claim based upon ACDSS's failure to advise them of the abuse or neglect that RBI purportedly endured before being adopted.  Although the Amended Complaint alleges a negligence claim only on RBI's behalf, see Am. Compl.¶ 24 ("The infant plaintiff was dependant upon the defendants for his basic needs."); ¶ 25 ( "The defendants owed a duty to accord the infant plaintiff such services as were necessary for his reasonable safety. . . ."); ¶ 26 ( "The defendants failed to perform that duty."); ¶ 27 ("Defendants' . . . negligence and gross negligence . . .  the plaintiff has been damaged . . . ."), the Court will address the claim because Defendant has not asserted an objection based upon prejudice or surprise arising from the late insertion of this claim.

Rather, Defendant argues that any negligence claim by the Ingraos cannot be made out against Albany County because the ACDSS and the Ingraos were not in a special relationship and,

22

therefore, ACDSS owed the Ingraos no special duty.  However, under New York Law "[i]t is only

necessary to establish a 'special relationship' when the defendant otherwise owes no duty to the

plaintiff."  Sean M., 20 A.D. 2d at 158. (citing Cuffy v. City of New York, 69 N.Y.2d 255 (1987)).

Here, the ACDSS owed the Ingraos, a prospective adoptive family, the duty to provide them with

RBI's complete medical history. See N.Y. Soc. Serv. L. § 373-a.  Plaintiffs contend that the ACDSS

failed to provide them with RBI's medical history, including the assessments performed by St.

Anne's Institute and by Children's Hospital, both of which would have indicated to some degree

that there was a suspicion that RBI had been sexually abused.  Thus, to the extent that the failure to

provide these records arose from negligent conduct, Defendant's motion is denied.  Further, to the

extent that Defendant negligently misrepresented RBI's background, the motion for summary

judgment is also denied. See  Rose v. American Tobacco Co., 2004 WL 986239, at * 3 (N.Y. Sup.

Ct. N.Y. County Feb. 20, 2004)("A viable claim of negligent misrepresentation requires the plaintiff

to demonstrate the existence of a representation of material fact, falsity, scienter, justifiable reliance

and injury.")(citing Grammar v. Turits, 271 A.D.2d 644, 706 N.Y.S.2d 453 (2nd Dept. 2000); Fab

Indus., Inc. v. BNY Fin. Corp., 252 A.D.2d 367, 675 N.Y.S.2d 77 (1st Dept. 1998)).

   Again, when the evidence is viewed in the light most favorable to the Defendant, it is

possible for a jury to conclude that there was no negligence or misrepresentation.  Thus, Plaintiffs'

cross-motion must also be denied.

### f.  Fraud, Concealment, and/or Misrepresentation

   Finally, Plaintiffs Heidi J. & Bradley B. Ingrao asserts a claim of wrongful adoption,

contending that the representatives of the ACDSS committed fraud, concealment, or

misrepresentation when they advised the Ingraos prior to RBI's adoption that he had not been

sexually abused to induce them to adopt RBI.   Defendant argues that there was no fraud, concealment, or  misrepresentation because it was never concluded that RBI had been sexually abuse and no evidence existed establishing this fact. In addition, Defendant argues that even if there was a misrepresentation in this regard, it could not have induced the Ingraos to adopt the child because RBI lived with Ingraos for one year before they made their adoption decision and, during this time, RBI exhibited many of the behaviors which the Ingraos now contend point to his having been sexually abused.

Claims for "wrongful adoption," which "have only recently been recognized as viable tort actions in New York," are premised upon "an extension of well-settled common-law fraud principles to the adoption process."  Ross v. Louise Wise Servs. Inc., 28 A.D.3d 272, 330 (1st Dept. 2006) (citing Juman v. Louise Wise Servs., 211 A.D.2d 446, 447 (1st Dept. 1995) ).  This extension of tort principles was deemed warranted to "advance New York's vital interest in the welfare of its children, as well as in the adoption process, which advances that vital interest."  Id. In order to make out a prima facie case for wrongful adoption under New York law, Plaintiffs must establish that: (1) Defendant made a representation as to a material fact; (2) such representation was false; (3) Defendant intended to deceive Plaintiff; (4) Plaintiff believed and justifiably relied upon the statement and were induced by it to adopt RBI; and (5) as a result of such reliance Plaintiffs sustained pecuniary loss. Juman v. Louise Wise Serv., 159 Misc. 2d 314, 315 (N.Y. Sp. Ct., N.Y. County 1994), aff'd Juman, 211 A.D.2d at 447 ("The IAS Court, prior to compelling disclosure, properly determined that the plaintiffs' complaint, grounded in claims of fraud and misrepresentation, alleged a cognizable cause of action for 'wrongful adoption.'").

Plaintiffs have cited to specific portions of the record from which a reasonable fact finder

24

could conclude that, although there was never a finding by a court or medical professional that RBI had been sexually abused, representatives of the ACDSS suspected that RBI had been sexually abused. See Pl. Opp. to Def. L.R. 7.1 Stat. Mat. Facts, ¶ 28.  Plaintiffs have also raised a question of material fact as to whether the ACDSS shared with them all of the information that ACDSS knew or believed about RBI, especially with regard to his having been sexually abused, and whether or not they would have adopted RBI if they had been advised of these concerns.   Construing these facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that the ACDSS's representative who spoke with the Ingraos before they committed to adopt RBI misrepresented his background in order to induce the Ingaos to adopt him.

The question of reliance, however, is more troubling in light of the fact that the Ingraos lived with RBI for year before they adopted him.  Nonetheless, a jury might reasonable conclude that, despite the indications to the contrary,  the Ingraos did not conclude before they adopted RBI that he had been sexually abused because of the assurances given to them by ACDSS representatives.  Thus, a jury might conclude that the misrepresentation, if occurred, was reasonably relied upon the Ingraos and caused the adoption that otherwise would not have occurred.  Accordingly, Defendant's motion in this regard is denied.

To the contrary, however, Plaintiffs have not established the lack of questions of material fact on these issues. Indeed, a jury might well conclude on this record that ACDSS representatives were not aware of sexual abuse in exist in RBI's background, or that, if a misrepresentation occurred, that it was not relied upon in the adoption decision. Therefore, Plaintiffs' cross-motion for summary judgment on this claim is denied.

**V. CONCLUSION**

For the reasons discussed above, Defendant Albany County's motion for summary judgment [dkt. # 136] is **GRANTED IN PART and DENIED IN PART**.  In this regard, the Second and Third Causes of Action in the Amended Compliant are dismissed in their entirety, and the Third Cause of Action is dismissed inasmuch as it asserts a substantive due process claim on behalf of Plaintiffs Heidi J. and Bradley B. Ingrao.  Plaintiffs' cross-motion for summary judgment [dkt. # 146] is **DENIED** in all respects.


**IT IS SO ORDERED.**

DATED:  October 2, 2006

Thomas J. McAvoy
Senior, U.S. District Judge